DENSTON and another, assignees of DICKEY *v.* MORRIS and others, assignees of SANDS.

It is a well settled rule of equity that a grantee, to whom possession has been delivered under covenants of title and warranty, can have no relief in this court against his grantor for a return of purchase money or security, on account of a deficiency or failure of title.

If a grantee in possession has taken no covenants and the title fails, he will be without a remedy in equity as well as at law, provided the contract were fair and no fraud.

But if fraud is shown in making the purchase or in completing it and whether there be covenants of title or not, the purchaser may come into equity for relief or to obtain indemnity against eviction, disturbance, or defect of title. These circumstances take the case out of the general rule.

When surviving assignees in bankruptcy are looked upon as trustees of a fund in their hands, the substituted assignees who are joined with them are so likewise and they should be parties to a suit connected with such a fund.

The statute of limitations or a staleness of demand should be set up by plea or answer and cannot be taken advantage of by demurrer.

Assignees of a bankrupt sold a lot of ground for $4,300. to 1. S. with a promise of covenants in fee and a warranty; the latter took possession and expended money in building; the assignees then refused to give a deed with full covenants or warranty and fixed him down to take a deed with a covenant against their own acts only and took a bond and mortgage for $4,000. payable in five years, upon the understanding that if their title failed they would return the purchase money and, in the meantime, would not pass the mortgage away; the assignees, without the knowledge of I. S., were notified of an intention to contest their title; I. S. sold to R. D. who paid off the mortgage (the assignees having, against their promise, parted with it); one J. J. brought ejectment upon a paramount title and recovered against R. D. who compromised; and R. D. failed and assigned his property to assignees who filed a bill against the assignees in bankruptcy for repayment of the amount which R. D. had sacrificed upon the compromise. The defendants put in general demurrers: *Held*, that the assignees in bankruptcy not only took the mortgage in trust, but were to be considered as trustees of the money arising from it and that R. D. and those representing him were entitled to the benefit of it; and, consequently, that the demurrers must be overruled.

This case came before the court upon demurrers taken by the defendants Robert Morris, junior, John Delafield and Charles Rhind to the whole of the complainants bill.

The bill alleged, in substance, that Robert Morris junior, and John Mowatt, junior, assignees of the estate of Comfort Sands, a bankrupt, falsely stated to one John Sandford that they, as such assignees, were seized in fee of and were authorized to sell and convey a lot of ground, known as Number 73 Greenwich street; and, in order to induce Sandford

*April 10th.*
1833.

*Vendor and Purchaser.*
*Parties.*
*Statute of Limitations.*

to purchase, represented their title as indisputable and pro-
mised, if he would make the purchase, to give him a warran-
tee deed and defend the lot against the claims of all persons
who should lawfully claim the same.    That about the first
day of April one thousand eight hundred and twelve, Sand-
ford agreed to purchase the lot from them for four thousand
three hundred dollars, which was the full value, upon the con-
ditions above mentioned ; and they put him in possession for
the purpose of his making improvements—leaving the deed
to be executed at a future day—and, that he forthwith com-
menced building upon the lot.

After Sandford had expended considerable monies upon
the lot, and about the fifteenth day of July one thousand eight
hundred and twelve, he applied to these assignees for a war-
rantee deed ; and which they promised to give him.    But,
shortly afterwards, they tendered to him a deed of convey-
ance of the lot containing only covenants against their own
acts as assignees and for such further assurance as they
might, as such assignees, rightfully make whenever request-
ed.    That Sandford objected to such a deed and required
them to execute a warrantee deed as promised ; which they
refused : assigning as an excuse, the advice of their counsel
not to execute such an instrument—but again assuring him
of their title, as assignees, being undoubted.    And in order
to induce him to accept the deed without covenants, they fur-
ther proposed and agreed to require a payment of only three
hundred dollars in money and to take his bond and a mort-
gage of the lot for four thousand dollars (being the balance
of the purchase money) payable five years after date ; and
that they would hold the bond and mortgage in their own
hands, and not assign the same to any person or claim pay-
ment of the principal, until the title of the assignees was es-
tablished or made perfectly satisfactory to Sandford or his
assigns.    That they refused to execute any other deed ; and
threatened if he did not accept of the one which was proffer-
ed, to sell the lot to some other person and thereby deprive
him of the monies which he had expended in building ; and
Sandford, relying upon their representations and assurances,
finally agreed to accept the deed, and the same was accord-
ingly executed and delivered to him.    It was dated the twen-

1833.

DENSTON
*v.*
MORRIS.

ty-first day of July one thousand eight hundred and twelve; and thereby the assignees conveyed to him, in fee, all the estate, right, title and interest which Comfort Sands held at the time he became a bankrupt, and which they, as assignees, had or could convey of, in or to the said lot of ground.

Simultaneous (as the bill showed) with the execution and delivery of the deed, Sandford paid to these assignees, Morris and Mowatt, the sum of three hundred dollars and gave his bond and a mortgage of the property for four thousand dollars payable on the twenty second day of July, one thousand eight hundred and seventeen with interest. That this was done upon the understanding before mentioned and upon the further stipulation and agreement of Mowatt, one of the assignees, who delivered the deed and accepted the bond and mortgage, that if the title of the assignees should fail or prove defective from any cause, the assignees would return the purchase money paid and secured by the bond and mortgage. That in violation of the promise not to part with the bond and mortgage, the assignees had, on the fifth day of March one thousand eight hundred and fifteen assigned the same to a Mrs. Grayson, without the knowledge or consent of Sandford and in bad faith towards both him and her: because they then knew or had been informed of their having no title or that it was intended to contest the title as conveyed by them to Sandford. That Sandford remained ignorant of any such defect and intention and went on to finish the buildings erected by him on the lot, consisting of a brick dwelling house and stable; and afterwards sold the same to Robert Dickey for thirteen thousand dollars and conveyed it to him in fee by deed bearing date the twenty-sixth day of February one thousand eight hundred and sixteen. The purchaser, Dickey, discharged the bond and mortgage held by Mrs. Grayson, she having required the same to be satisfied.

The bill further alleged that afterwards and on or about the first day of May one thousand eight hundred and sixteen one John Jackson commenced an action of ejectment against Mr. Dickey in the Supreme Court for the recovery of the land, which action was tried at a circuit court; and in January term one thousand eight hundred and nineteen judgment was rendered thereon in favor of the plaintiff Jackson, his

title proving to be paramount to that of Dickey as taken from the assignees of Comfort Sands.

The bill then set forth the title under which Jackson claimed and recovered in the ejectment suit; and it charged how, upon the trial, it appeared that the assignees had, long previously to the purchase by Sandford, been notified of the circumstances of such title, and were informed of their having no title whatever as assignees and no right to consider the lot as the property of Comfort Sands at the time of his becoming bankrupt; and that these circumstances first came to the knowledge of Dickey and of Sandford upon the trial of the ejectment suit; and, therefore, as the bill insisted and charged, the assignees acted in bad faith and fraudulently in selling and conveying the lot of land to Sandford in the manner above mentioned. The bill also alleged, that Mr. Dickey being satisfied, from what appeared upon the trial, that the title derived from the assignees was wholly defective and he would be deprived not only of the lot but also of the buildings, and being advised by his counsel to effect a compromise, if possible, he opened a negociation and finally succeeded in obtaining a release and extinguishment of Jackson's title, by paying to him, in way of compromise, two thousand five hundred dollars—he having agreed to consider the lot vacant, which it was when he purchased. Also, that upon the trial it appeared how the wife of Comfort Sands would be entitled to dower if she survived her husband; and that a release from her was obtained by paying the further sum of three hundred and twenty-five dollars. That although, while the negociations for the compromises were going on, Mr. Dickey failed in business, yet he completed the arrangements and procured the releases to be executed to himself in the months of July and November one thousand eight hundred and twenty—still, owing to his pecuniary embarrassments, the payments were delayed until the month of February one thousand eight hundred and twenty-one, when the money was paid with interest and the releases were delivered. About the same time and in pursuance of a previous understanding with his creditors, he conveyed the premises (the title to which had then been made perfect) to the complainants, in trust for the benefit of his creditors.

One of the trusts required the complainants to refund the amount which had been thus paid, together with the law expenses of defending the suit and procuring the confirmation of the title: Mr. Dickey having raised the money for those purposes by a temporary loan. Immediately upon receipt of the deed of trust, the complainants advanced, out of their own monies, the sum thus paid, amounting to three thousand two hundred and thirty-nine dollars, which, as they alleged, was necessary in order to perfect the title to the property and render it available to the creditors of Mr. Dickey. And they claimed repayment of the same with interest out of the estate of Comfort Sands in the hands of the defendants, as assignees: because, 1st., they sold the lot to Sandford, the grantor of Dickey, knowing their title to be defective or that it was intended to be impeached or contested; and, 2ndly, for even if they had no such knowledge, they had received four thousand and three hundred dollars as the consideration for the sale of a lot which they had no right to sell and to which they were not entitled.

The complainants also alleged that the defendants, as such assignees, had funds in their hands growing out of the estate of the bankrupt, not yet apportioned amongst his creditors, greatly exceeding the amount paid by the complainants. That Mowatt, one of the original assignees, died in the month of May one thousand eight hundred and twenty-one, when the management of the bankrupt's estate devolved upon Morris, the surviving assignee, who had the sole charge thereof, until the month of June one thousand eight hundred and twenty-six, when the other defendants, John Delafield and Charles Rhind, were appointed assignees jointly with the defendant Morris. That frequent applications were made to Morris and Mowatt, as such assignees, and to Morris as surviving assignee, and similar applications had been made to the present assignees for repayment out of the bankrupt's estate in their hands, but without effect. That recently, at a meeting of the commissioners, creditors and assignees under the commission of bankruptcy held in the month of April, one thousand eight hundred and thirty-two, the complainants presented their claim, verified by affidavits; that the commissioners, having doubts in relation to their powers, directed

1833.

DENSTON
v.
MORRIS.

the assignees, by an order entered in their minutes, to retain three thousand dollars in their hands in order to meet the claim if the same should be established in a court of equity or before any other tribunal.

And the bill prayed that the assignees, out of the money belonging to the bankrupt's estate or the defendant Robert Morris, junior, one of such assignees, out of his own proper funds, might be decreed to pay the complainants the amount so paid and expended by them, with interest; and also, for general relief.

Mr. *P. A. Jay* and Mr. *D. S. Jones*, for the defendants and in support of the demurrers.

Mr. *D. B. Ogden*, and Mr. *C. Graham*, on the part of the complainants.

*June 25th.*     THE VICE-CHANCELLOR:—If there be any ground upon which the apparent equity of this bill can be supported in favor of the complainants, I shall gladly give them the benefit of it. From the statements in the bill it is manifest that by means of the sale to John Sandford, the assignees of the bankrupt's estate have received a sum of money which they had no just right to receive. A decree compelling them to refund would work no wrong either to the bankrupt or his creditors. Still, in order to entitle the complainants to come here in relation to this money, they must have a right to the same or to some portion of it and which must be paramount to the claim of the defendants. If this prove not so, then there can be no relief upon the present bill; and, consequently, the demurrers will have to be allowed.

Supposing the allegations in the bill to contain the truth, I think it very clear, from the face of it, that there was fraud on the part of the assignees in making the contract of sale with John Sandford, as well as in carrying it into effect; and, for all the purposes of the present argument, I am, of course, bound to take these allegations as true.

The alleged fraud, in the first place, consists in the assignees representing their title as valid and indisputable: knowing it to be defective and liable to litigation; while the refu-

sal to give a deed with covenants of title and warranty, after they had induced Mr. Sandford to become the purchaser, to take possession and commence building. upon the promise of such a deed, was a breach of good faith. And, moreover, the species of coercion made use of to induce him to accept the instrument (without covenants) cannot be deemed other-wise than fraudulent.

1833.

DENSTON
v.
MORRIS.

If the injury which resulted to Mr. Dickey, the subsequent grantee, had fallen upon Mr. Sandford and he had exhibited a bill in this court for relief, there would be no doubt of his right to a return of the purchase money—at least, of so much of it as would remunerate him for any expenditure in obtain-ing a perfect title—even though the deed contained no cove-nants which rendered the grantors liable at law. It is a well-settled rule of this court that a grantee, to whom possession has been delivered under covenants of title and warranty, can have no relief in equity against his grantor for a return of purchase money or security on account of a defect or failure of title: because he has taken care to secure himself by covenants and, if evicted, can have an adequate remedy at law. If he has taken no covenants, and the title fails, he will be without a remedy in this court, as well as at law, provided the contract were fair and there be no fraud in the case. But, if fraud is shown, either in making the contract of sale or in executing it, and whether there be covenants inserted in the deed to secure the title or not, the purchaser, in case of eviction or disturbance of his possession or when-ever it is ascertained that the title is defective, may come into this court to be relieved from his purchase or to obtain indemnity against the consequences of the fraud.

Imposition and fraud upon the purchaser by any wilful mis-representation or concealment, takes the case out of the gen-eral rule and entitles him to be redressed in equity, in addi-tion to and beyond the covenants in the deed. The cases of *Bumpus* v. *Platner*, 1. J. C. R. 213., *Abbot* v. *Allen*, 2. Ib. 519., *Johnson* v. *Geer*, Ib. 546., *Chesterman* v. *Gardner*, 5. Ib. 29., and *Gouverneur* v. *Elmendorf*, Ib. 79. are authorities upon these points. And see also in *Legge* v. *Croker*, 1. Ball & B. 514.

But the difficulty in the present case is this : Sandford is

1833.

DENSTON
v.
MORRIS.

not the party complaining of the fraud; nor, indeed, has he been injured by it. Before any eviction or even claim was made under an adverse title, Mr. Sandford sold and conveyed the property to Mr. Dickey for an adequate consideration and without any fraud on his part; and it does not appear that he entered into covenants of seizin or warranty. So, he is not liable over to his grantee or to the assigns of such grantee. Yet it appears to me there are equitable circumstances arising from some of the statements of the bill which may entitle Mr. Dickey and the complainants, as trustees under him, to stand in the place of Sandford and claim the rights and remedies to a certain extent which he would have been entitled to in case he had remained in possession and the judgment in ejectment has been rendered against him. I allude to the part of the bill which states the giving of the mortgage for four thousand dollars of the purchase money as an inducement to Sandford to accept the deed. The assignees proposed to take the mortgage payable at the expiration of five years and expressly agreed to hold the same and not claim payment until the title should be established or made perfectly satisfactory to Mr. Sandford or his assigns; and on delivery of the mortgage, Mowatt, one of the assignees, further stipulated to return the purchase money in case the title of the assignees should fail or be defective from any cause. According to this statement of the transaction, the vendors only became trustees of the consideration money (at least, of the part for which the mortgage was given). They were not to hold it as a payment nor as security for the payment absolutely, but only in the event of their title being made good to the purchaser and his assigns. Now, we may lay out of view all intentional fraud; and looking at the transaction in the above light, the whole will appear to be fair and consistent. The assignees, it is alleged, had been notified and were aware of an adverse claim of title. They had, in the first instance, contracted to sell to the purchaser and to give proper assurances of title, but were advised against the latter; and, therefore, they proposed the other method of carrying the sale into effect. In this way an implied trust, at least, was created of the purchase money; and such an one as this court is bound to protect and pre-

serve. Nor could the assignees divest themselves of the trust by assigning the bond and mortgage in the manner stated in the bill. When Dickey purchased of Sandford, the mortgage which the latter had given, instead of being in the hands of the assignees and subject to the trust upon which it had been given, was found to have been assigned contrary thereto. He was also required to pay it off; and it was satisfied out of the money which Mr. Dickey was to give for the property. Upon the assignment of the mortgage, the trust which originally attached to it must be considered as attaching to the money in the hands of the mortgagees and they may be regarded in equity as trustees of it by substitution. If then there be a trust fund and trustees of it: for whose benefit does it enure?

It must be remembered that the mortgage was to be held until the title should be made perfectly satisfactory to Mr. Sandford and his assigns. The nature and object of this arrangement appears to embrace all who might become purchasers under him, through the title which the assignees of the bankrupt's estate undertook to confer. The title failed. A loss resulted; and this has been borne by one who purchased from Sandford upon the faith of the title derived from the assignees, and which the trust was intended to secure. He or those standing in his place and taking his rights, are the persons entitled to the benefit of it.

When we take the allegations in the bill to be true, the present appears to be a case which entitles the complainants to the relief which is sought.

Instances will be found, observes an able writer on equity jurisdiction, to spring from some circumstances attending transactions, as of accident, mistake or fraud, which, in themselves, form grounds of this court's interference, inducing it to imply a trust upon what it ascertains to be the conscientious duty of a party; and, in accordance with its general principles, to compel him to the performance of that which natural justice demands: *Jeremy's Eq. Jur.* 94. There is some reason, at least, for supposing the present to be one of the cases falling within this salutary principle. And as I cannot do more, so I think I cannot do less than overrule the demurrers.

A distinction has been attempted to be made, upon the argument, between the original surviving assignee and the two assignees since then associated with him. It is said, that if the bill is properly filed against the former on the ground of fraud, yet it is not so as respects the latter, and their demurrer should be allowed. But, if I am correct in supposing the bill may be sustained upon the ground of a trust, then the circumstance of all the assignees being considered trustees of the fund sought to be reached, rendered them all proper parties to the suit.

Another point was raised upon the argument: that if there ever were a cause of action, it was barred by lapse of time. I cannot listen to this objection upon a demurrer: especially as the bill shows that the commissioners in bankruptcy have directed the assignees to retain a sum of money, in order to satisfy this claim, should it be supported in a court of equity. Besides, if the statute of limitations or the staleness of the demand affords any ground of a defence in a case like the present, I think it should be put forward by a plea or be set up in an answer: and not through a demurrer.

The last objection which I have to examine is this: that it belongs to the commissioners and the district court of the United States, under the authority of the bankrupt law itself, to decide upon this claim; and that the court of Chancery has not jurisdiction. I think it is a sufficient answer to say, it is not a debt claimed to be due or owing from the bankrupt or to be paid out of his estate *pro rata* with the creditors, but a remedy sought against the assignees in relation to a sum of money which has found its way into their hands, and not belonging to the bankrupt—that it is a trust-fund to which the complainants are equitably entitled, and over which (as well as over those assignees as being trustees) this court has a concurrent, if not an exclusive jurisdiction. Indeed, the bill states that the commissioners entertained doubts of their powers; and referred the parties to a court of equity or other competent tribunal; and I must presume this was done on account of the claims partaking of the nature of a trust and was not a debt or demand against the bankrupt.

I must overrule the demurrers, with costs.